on to the second shift of the Fourth Circuit today. Mr. Kamens, the boss man of it all. Good to have you with us, sir. Thank you. I'm very happy to be here. May it please the court, when a defendant is imprisoned in a foreign country with a valid extradition treaty with the United States, where extradition is the only viable means of obtaining custody of that individual, the failure to seek extradition is delay which is attributable to the government for purposes of the Sixth Amendment speedy trial right, unless seeking extradition would be completely futile. But futility cannot be assumed. The Supreme Court's decision in Smith v. Huey establishes an affirmative duty on the government after filing charges to make a serious effort to obtain custody, and it noted that the possibility of refusal is not equivalent to asking and receiving a rebuff. How do you define, you said only viable means. What, how do we know whether, why is, what's first, what's the line, what's the definition, what's the principle that determines viable means? Well, it's got to be based on the record. In this case, the record is very clear that Mr. Chaudhry, Umar Chaudhry, our client, is a dual citizen of Pakistan and the United States, and when he was held in Pakistan by Pakistani authorities, there is no way to obtain custody of Mr. Chaudhry by having Pakistan deport him because he is a citizen. It is a principle that is universally understood both in the United States and around the world that countries, almost every country, does not deport their own citizens. That is, deportation is reserved. Is it your belief that the interaction that went on in this case, that I guess would be under the, you know, umbrella of deportation is something, you know, other than extradition? That's true, and the government said that below as well, that the, they made a single diplomatic note, but there was a good bit of back and forth, you know, about whether that would happen or not happen, and there was no express statement that, look, we're not going to do that for some period of time, and so that's what I'm getting at. I appreciate your principle that deportation may have been unlikely, may not have been permitted, but, you know, the extradition says, shall not extradite pending charges, and so, you know, I think we're dealing with two things that there might be a, not a great likelihood, but a possibility of, and so I'm just trying to figure out why, what they were pursuing isn't viable, I guess. And it, well, it wasn't viable because Mr. Chaudhry is a citizen of Pakistan, and so asking Pakistan to deport one of his own citizens would have violated the Pakistani Constitution. It's in the blue brief we've cited it. I appreciate that. There's no indication in the record that the, you were adverted to Article 4 of the extradition treaty. There's nothing in the record to suggest that in 2010 or thereafter, the United States looked at the extradition treaty and said, oh my gosh, look at Article 4, we got to sit around and wait on our hands. The only thing they did is issued a single diplomatic note, and you're right, there was additional back and forth. There was a meeting in June of 2010. I've learned that there is a difference in terms of diplomatic communications about the formality with which the country communicates with another, so the State Department helpfully provided a timeline of their efforts in this case. It's on page 392 of the Joint Appendix, and it lists that single diplomatic note from January 15th of 2010, and the next entry is 2019. So essentially between 2010 and 2019, the government did nothing other than send that diplomatic note asking for deportation. The government has two principal arguments here. Well, let me say first that the Supreme Court has clearly set forth the principle that the government has the duty to make a serious effort to obtain an individual who is in custody of another sovereign. The district court erred in denying the motion to dismiss because the government made no serious effort. Now the government has two principal arguments against relief in this case. One of them, Judge Quettelbaum, is the Article 4 that you adverted to. The other is that because extradition from Pakistan takes a long time and rarely is successful, that the government's requests for deportation were sufficient to constitute a serious effort to obtain custody. He was in prison. He was in prison, that's true, and even when an individual who has been charged in the United States is in prison by another sovereign, the government still has the duty to try, that is, to make a request for their return. Well, is trying enough? Because I thought your contention was they didn't make a formal extradition request. I mean, the record seems to indicate they tried and did some things there. I mean, you had numerous opportunities. You had the ambassador meet with him, the legal attache, they made the efforts there, but here's the question that I guess is sort of interesting to me. I think you say that Pakistan manufactured the charges against them. That would seem to suggest me, if they would do that, why in the world were they extradited? I mean, why would they deport him if it almost seems like it'd be a passport? Because you say they obviously just wanted to prosecute him. So, absolutely, there's evidence in the record completely manufactured charges in Pakistan, but what, Judge, when you're asking is, what would Pakistan have done if the United States had asked them to extradite? And we don't know. It's possible they could have refused, but that's the lesson that we have from Smith versus Huey, that the possibility of refusal is not the same as making the request. Now, I want to be absolutely clear here. We are not asking this court, and we don't believe it's consistent with the law, that there is a bright-line rule that every time an individual is overseas, held by another sovereign, the U.S. has to make an extradition request. The standard is a serious effort to obtain custody or exercising reasonable diligence. What was he charged for in Pakistan? It was conspiracy to attack Pakistani military bases and a nuclear facility. And he was charged in the United States with? Conspiracy to provide material support to a designated terrorist group, Jaish-e-Mohammed, J-E-M, so they're comparable. I mean, it sounds kind of kin to me. It does. You would think that, it doesn't sound so manufactured to me, you either would have to prove the evidence, and I don't want to challenge the Pakistani legal system, I'm assuming you've got the same kind of rights, so you got rights there too, but they went through a trial process, and the charge itself doesn't sound like it's far-fetched because it's sort of similar to what the United States wanted to charge him with. And he was in Pakistan, that's the key. He left from here, from here, he went to Pakistan, and the actions are taking place for the U.S. military in Pakistan. And he was convicted? And he was convicted. And sentenced to 10 years? And he was sentenced to 10 years, along with his four compatriots. Let me say two things. One, the sort of legal implication, if that were true, and then the facts of what actually happened. So the legal implication is, if the Pakistani charges were akin, as Judge Wynn, you just said, that they were similar to the... I mean, if you say, they say he was going to deal with the Pakistani military, which is more likely, because you've got the military, the United States, in the United States, you're going there to deal with the United States military. You got to first get to them, and then you got to deal with it. So, I mean, it seems just as plausible to me as it does for the United States military. If the charges were related, then Article 4 of the treaty says that the delay is only until the conclusion of the Pakistani prosecution, and not until the conclusion of the sentence. So if that were actually true, and if the government believed that was true, that the charges were the same, then Article 4 would not allow a deferral. When was our charge lodged? Our charge was issued, I think it's December 29th of 2009. That's the complaint warrant and the international red notice related to the complaint, asking Interpol to tell Interpol countries to arrest an individual. And that relates to the... He was indicted when? ...factor, which is when does the speedy trial clock start ticking. It's very clear it starts when, as this court said in Thomas and a case called Woolfolk, when the complaint and arrest warrant international red notice were issued in December of 2009. Now, the government disputed that below. On appeal, they've essentially abandoned that argument. Basically, that's the length of the delay. That's the length of the delay. So the government pretty much acknowledges you can establish that factor, I think. They do, but it's a two-part inquiry. So the first thing that they acknowledge is that the delay triggers judicial review. And that's only a delay that requires... What's the reason for the delay? That's the problem. The reason for the delay is the second part of the factor. It's very important. But the length of the delay is also really important. So we say the length is 10 years. And the government says, well, you don't need to decide that, but you do. It's clear that under the first factor, you have to decide both parts. One, is there a sufficient delay to require judicial review? Government agrees on that. And then the second is how long is the delay? The delay here, we argue from 2009 until the trial date was set, 2024. Now, there's... But it wouldn't matter if it was 10 years or 20 years if the reason for it was satisfied, would it? Well, let's see. Let me parse that. It would... I'm saying if you can establish, government can establish a reason why it was 20 years, it could have been that Pakistan says, no, you don't need to submit us anything. We're going to keep you here for 20 years in this jail right here. It wouldn't have mattered if that was 20 years. That's absolutely right. So if the government had a statement from Pakistan, hey, we're not going to deport you, we're not going to extradite this individual, that would be a showing of futility. That's what the cases say. If the country says, we're not deporting individual charged with drug offenses, or you don't have a valid extraditable offense, or we're not going to extradite this individual, then that's futility. So I'm going to ask you this because I just want you to help get my mind off of this business that he's charged with attempting to do something to the Pakistani military. And then it seems to me, if you had a reverse situation of a Pakistani dual citizen in Pakistan came to the United States, and he's charged here with U.S. military, I can't imagine we would send him back before that sentence is done. I cannot imagine. And I can imagine Pakistan is going to do that once you are convicted of doing something to our military, we're going to send you somewhere else to be tried. That's... That sounds like it's futile to me. It's certainly fair, although it is up to the sovereign to decide the timing of surrender. So it is absolutely the case that we would go through our process and impose a sentence. But then if the government decided, well, we want this other country to be able to engage in their process, the executive branch gets to decide whether to enforce a provision. So we cited... But if it was, if it was, he was shoplifting, or he jaywalked, or maybe sped on the side of the highway in Singapore or something like that, that's one thing. But this charges, he's attempting to do something to the Pakistani military. And he's convicted of it in Pakistan. And you say, it's not futile for another country to say, why don't you just release him and send him to us, where he could be found innocent of stuff, then you got to figure out how to get him back to do that. Well, the law is you have to ask. You can't just wait on your hands and assume what the answer is. Your position is that the nature of the charges or the conviction doesn't have anything to do with it? It doesn't, actually. I mean, unless it's not an extraditable offense. That doesn't make any sense. Well, let me let me be clear. So the speedy trial... Based on what Judge Wayne just said, the comparison he made, I mean, that the nature of the charges wouldn't make any sense. Well, again...  It wasn't lingering on the side of the road or something. The government can't assume that Pakistan will deny it's a lawful extradition if we make the request. An extradition is an order... They're not assuming that. Maybe they could assume, maybe futility is there. But even if it's not futile, I mean, they've spent a decent amount of time. Judge Wayne talked about some of the efforts they've made. They've gotten really... And they've got the history of having requested extradition before without success. And then he's convicted and is in jail. And they start interacting again when they hear the sentence might be coming up and have a lot of effort and activity going on there. You know, it just seems to me it's hard to say they're not actively engaged in trying to get him back before and after his conviction. So that assumes that deportation is a way to get him, but it's not. And the government can't assume that Pakistan will deny a request for extradition. That's the lesson of Smith v. Dewey. So in that case, Texas assumed that the Federal Bureau of Prisons wouldn't send the defendant from BOP custody to face trial in Texas. But that's not what the speedy trial right requires. They have to ask if there's a viable extradition treaty and the claim is extraditable. Now, we can all assume that Pakistan might say, nope, we're going to keep this person here. But in this case, this was a completely sham prosecution. The evidence is in the record below. And all Pakistan wanted from the prosecution was a propaganda value that may have been satisfied by the trial. Which prosecution was a sham prosecution? The one in Pakistan. The one in Pakistan was a sham prosecution. That's right, with false evidence. The one in Virginia was not a sham prosecution. No, I don't think it was. But he didn't get any sentence. Well, if I can respond, my time is up. It wasn't just the prosecution in Pakistan, it was a trial and a conviction. So you're saying the whole process was a sham, not just the charges. You're saying that the judge was a part of the sham, the trial process was a whole, and the ultimate sin is a sham. So you're saying the whole system was a sham. So my time is up, but can I explain? As long as you get questions, there's no answer. So this is in the briefing. But essentially, the United States at this time was criticizing Pakistani intelligence for supporting the Taliban and anti-United States forces in Afghanistan. And so to respond to that, you had these five Americans who, by every piece of evidence that we ever received from the government, were intending to go to Pakistan so they could go to Afghanistan and help Muslims and potentially fight against U.S. troops there. But they were convicted of doing more. They went there to terrorize the American military there. Not American military in Pakistan. The Pakistanis said, these Americans— That's their intent of going there. It wasn't just—they weren't a Red Cross or a nice little aid group that was going over there. They were going over there to do some terrorism, whether it was in Pakistan, Afghanistan, two American forces. Well, terrorism is a loaded term. So the intent— What is the conviction? The conviction is that— If we're talking about the United States prosecution, that was about going to Afghanistan. That wasn't a sham. You made that clear. It was not. That was clear. That's true. But that one they did in Pakistan— Right. Pakistan was about these five individuals. Pakistan prosecuted them for essentially being U.S. agents to come and commit terrorism in Pakistan against the Pakistani military. That was 2010. And that was 2010. It was a complete sham. And it was for propaganda value. And the evidence was fraudulent. And that's in the record. And here's the other information is, my friend on the other side, both below and in these briefs, has never denied that the Pakistani prosecution was completely fraudulent. And so there are certainly cases where the United States can stand back and say, we have no interest in interfering with another sovereign's prosecution. We've made a considered judgment not to interfere. That's not what happened on this case. In this case, the government had no interest in waiting by for Pakistan to engage in this completely sham process that they knew was a sham. And that's why they've never— But does the— I think Judge Wynn may have asked about this earlier. I mean, does that sham issue cut both ways? I mean, let's assume we agree with you that they've engaged in a propaganda-based trial. And that's a pretty serious thing. But let's assume that they're willing to go to those lengths to engage in a totally fictitious trial and lock one of their citizens up for 10 years. And you're saying it's not reasonable that our government, it's reasonable to believe that the government that engages in that sham process is going to say, all right, here's this convicted citizen. Go ahead and extradite him. I mean, it seems like the sham stuff may hurt you more than it helps. So you make a good point. It's very possible that Pakistan could have said, no, we're rejecting your request for extradition. But the possibility of refusal is not the same as making the request and getting a rebuff. But possibility is one thing. I mean, I think you're right. You can't just sit there and say, well, it's possible. But all signs here, all of them, I mean, history, what they've dealt with before, their efforts to get him both through deportation and then this sham stuff, it seems to me that's more of a possibility. It seems like it's a high probability. So essentially, you're saying that it was futile, right? But this court would be going beyond where any court of appeals has said futility is. So if you look at page 38 of the red brief, they list five cases where they say, if it's futile, you don't have to ask for extradition. Every one of them, and I encourage you to look at every one, they are in cases where the other country has said, we're not extraditing that individual, or they are charged with an offense that's not extraditable under the treaty, or we're not extraditing drug defendants, or we're not extraditing citizens of the country. Every one of them, absolutely clear cut. In this case, the government says itself that extradition has been successful. There was one that was successful in 2015, one in 2021. This client, Mr. Chaudhry, was successfully extradited. His co-defendant was just successfully extradited about a month ago. I can submit a 28-J, but it's in the district court docket, because he made his Rule 5 appearance. So it's not as if extradition was futile in this case. And if it's not futile- He was extradited after he was tried, charged, and sentenced. That's true. And served his sentence. Absolutely, but still- And he served his time. Was that a legitimate time? He served an incredibly difficult 10 years in horrific conditions in Pakistan. He was actually in the penitentiary, or someplace. Absolutely, for four years in a very high security- He just wasn't running loose on supervised release. No, no, he was absolutely- And that's, you know, of course, why my friends on the other side agreed to the resolution of this case that they did, and we certainly appreciate that. But the point is, it was incumbent upon the United States to make a request for extradition, because it wasn't futile. And you made a deal to get him no time here. That's true. We entered a conditional plea, and the government and the defendant jointly recommended a sentence of time served and 20 years of supervised release. Time served, that means he's pretty lucky. Well, if you can call 10 years in high security Pakistani prison- But he'd already done that, and he was facing more here. That's true, and I think that- You're working magic. Well, I think that the government recognized they didn't- there was no more need for any deterrence against this individual. And so that's why, if the court were to grant relief in this case, it's no skin off the government's nose. I bet they'll say they had a good case against him. They may, of course, but that's not the question before this court. So, I would just say that the Supreme Court has said that the more weight the government attaches- Well, he was charged with terrorism. They had to go to a grand jury and convince him. There was probable cause to charge him with aiding terrorism, or whatever you, however you characterize the thing. Absolutely. That's a tough charge. Absolutely. And there's no doubt that the government had a good faith basis to bring the charge- And he walked on it. Well, I wouldn't say walked on it. I've never heard of this before. I've been around a lot of criminal cases. Thank you, Your Honor. Over the years. The sentencing memos in the- You did the best I've ever seen. Thank you. The road was paved by two co-defendants before me. And now you're trying to get him out and done with this. Well, I think this morning you heard that the Supreme Court had issued a decision already in the case that you'd heard this morning. Let's stay right here.  The Supreme Court hasn't issued a decision in this particular case, but it's come close in Doggett, where in Doggett, the- Judge Winskill's going to start arguing about preliminary charges. That's right. The Supreme Court issued an opinion in Doggett where the government in that case, they knew that a defendant had gone to Panama. And the agent just said, well, it's futile to seek extradition, so I'm just going to ask Panama to return him and deport him at the end. And they didn't. And the guy came back into the country, and they didn't do anything for another eight and a half years. Doggett's very close to this case. The last thing I'll say is that the government's principal argument here is that it was really hard to seek extradition, and they lose a lot. And to me, that's very familiar to federal defenders coming before this court. It's very hard, and we lose a lot, but it doesn't mean that we don't have to try and exercise as much effort as we possibly can. And that's what my friends on the other side had to do with respect to Mr. Chauvin. That's an interesting analogy, and I appreciate what you do, by the way. And you do do it well. We're not joking about that. But I think in the reasonableness, the standard might be a little different, or it might be that you don't have to pull out every single stop, do everything imaginable. You just have to exercise an appropriate level of effort. So I think doing everything you can, if that was the standard, we might have one thing. But if the standard is something less than that, then maybe it's a different question. Absolutely agree, Judge Quattlebaum. But asking another country to deport one of its own citizens isn't a reasonable way to get custody of that defendant. I understand your position. Thank you. Thank you. Thank you. And you've reserved some time. We gave you a lot of extra time. Thank you, Your Honor. Yeah. You hit the jackpot. Mr. Mathias, good to have you, sir. Thank you, Judge King. Good morning. May it please the court. Your Honor, the crux of this appeal, as we heard this morning, is the second Barker factor. That's the reason for the delay. And distilled down to its essence, there are two key reasons for the delay in this case. The one, which is most obviously the defendant was arrested, prosecuted, and convicted, and then sentenced to a decade in prison in Pakistan. What does it take to make a formal extradition request? You just ask? Not exactly, Your Honor. The declaration from our expert, Jeff Olson, paragraphs 8 to 12, around 8 to 12, describe the process. It starts within DOJ. It then moves to the State Department. It then gets certified at very high levels within the State Department. It then goes to Pakistan, goes through their political levels. It then ends up in the courts. And then once it's in the courts, it can be challenged, and these proceedings can take. But it starts in the U.S. Attorney's Office? It starts in the U.S. Attorney's Office, in combination with an office within the Department of Justice, then goes to the State Department. But what's the reason you didn't seek extradition? Sure. So two main reasons here. So number one is that Article IV of the Extradition Treaty provides that extradition shall be deferred until the completion of the trial and the full execution of the sentence. Completion of the trial? Full execution of the completion of the trial, and then the full execution of the punishment. Full execution? Full execution of the punishment. So your colleague says there's no indication y'all considered that. That that's just in the record and you're doing it now for litigation purposes, but there's no indication that was the actual reason. I think he said something to that effect. Before you go to your second reason, do you have an answer on that? Sure. So our expert, Jeff Olson, explained that based on their experience with Pakistan, his office's experience with Pakistan, they would frequently advise prosecutors to seek the informal route as a general matter. And then there are two places in his affidavit where he explained that they read Article IV, and it's written in past tense, that Article IV obliged them to wait until after the sentence. Is that because, I mean, I'm trying to figure out why is it better to go informally? Is it, is there a greater chance of, is the thought that there's a greater chance of success if you don't have an official decision like an extradition decision? I'm just, why is one better than the other? I think that's, I think that's right. I mean, our expert, Jeff Olson, explained that extradition from Pakistan was basically the exception and not the norm, and that in the majority of the cases, extradition would go unanswered, and the requests were misplaced, they would have to be resubmitted, and that most were not even answered at all, and that there was what they viewed as an expedited option, an expedited option where we could submit basically something like this informal note. It basically cuts out the court element and some of the other political levels, I believe, political levels of review. It still has to be certified at a political level, though. But here, what's interesting about this case is he's a citizen of both the United States and Pakistan. I'd go on a limb and said he probably was originally a citizen of Pakistan, and then he's been naturalized here. There have been some efforts that I've been to understand is how you unnaturalize a person, but neither here nor there. I'm not trying to say one is more important than the other, but why? I mean, he's a citizen of Pakistan, so why would they extradite him, even if there is a formal request? You don't have to. He's our citizen. They said, well, he's our citizen equal, but he says, well, he was our citizen first. He's here attacking us. So is that a factor, the fact that he was, would it be different if he was only a citizen of the United States? So the reason why we sought the deportation— Is the answer to that question yes or no? Not really. Well, yeah, it matters in the sense that we would not have asked Pakistan. We would not have moved through the informal route had he only been a Pakistani citizen. The reason we asked— The question is, had he only been a United States citizen? If he's only a United States citizen and he does the same thing, what he's doing, is that a different, do you take a different approach with that? I don't think so, Your Honor. I think with a United States citizen, we would have wanted him back. If he was just a United States citizen or a dual citizen, we would, we are always going to take the option that we think is the most— So you're saying that if he was a Pakistani citizen, it doesn't make any difference? For our request or for Pakistan's purposes? Well, for what you're doing. It matters in the sense that we sought the deportation option because he was both a U.S. citizen and a Pakistani citizen. That option is the more expedited option, and it was one that Pakistan, at least in principle, and I'd like to— The question is, can Pakistan legally deport one of its own citizens? Sure. So I think the answer on this record is yes, and I can point the Court to two places. Number one, which is the very first meeting that we had on December 15th with Pakistan, that's where the AILAT meets the Director General, and they discuss how to seek custody of the defendant, and the government representative asked— And deport is the same as extradite? Not exactly. My question was, can you deport him? Yes. Well, you can certainly extradite, and the answer, I think, also is on this record that Pakistan, at least in principle, had no objections until 2020 to deporting— So you're telling me Pakistan has deported its own citizens to another country? I can't tell you what they've done previously to other countries. I can only tell you what's in this record. Have we deported any of our citizens to another country? I don't believe so. So the argument, though, is it sounds like the U.S. hasn't done it, you don't have any evidence Pakistan has done it, but the interactions that you had here led you to believe Pakistan was considering it? That's exactly right, and if you go to the record, and this is JA-114, that's the record of the interaction I was just describing, that's the very first meeting we had after the defendants were arrested, extradition is raised, we then respond and say, would Pakistan be willing to deport? And the response that we get from the Director General is, quote, it's possible, harder now that the intelligence services are involved, but that it's possible, and we should get our request in soon, and then follow it up with a high-level sort of follow-up from the U.S. ambassador, which is exactly what we did. And then on June 18th, and this is when the trial was, this is mid-trial in Pakistan, we have, there's another conversation between another government representative and the Pakistani Ministry of the Interior, where we ask if they can continue to hold the defendants briefly and suspend their visas just in case they're acquitted, and then we could deport them, and then Pakistan would deport them, and the response, at least in principle, was yes, and that's JA-165. And so all the indications that we're getting from Pakistan, at least initially, are, I mean, there's certainly no objection, and the response is, it's possible, you should pursue it, do it fast, basically. It's only until 2020, when the defendant is close to being, is close to finishing up his sentence, that they come back to us and say, we're not going to do this for two defendants, we'll extradite the three U.S. citizens, and then he's released, and then what do they do, exactly consistent with Article 4, is they come to us and they ask us for extradition papers, which is basically what totally tracks the extradition treaty, which says the extradition shall be deferred until the completion of the sentence. So, at the end of the day, still in your case, is it your position that the numerous examples that are set forth for the diplomatic efforts were made by the United States to its legal attache, its ambassador, the consulate to Islamabad, that that, those efforts demonstrate that it's sufficient to meet that reasonable diligence requirement under the Constitution? Absolutely, Your Honor. Anything else to your position that follows beyond that? No, Your Honor. I mean, our position here is that we, and it was the district court's view also, the diligence, the district court concluded here that... Nothing else you have goes beyond that determination right there. In other words, that basically sums up your position. That's exactly right. As the district court concluded, the government made extensive reasonable efforts to seek custody of the defendant. Your Honor, I'd be happy to address the assertion of the right or the prejudice factor if the court has any questions. Otherwise... How can we let him off the easy? Well, that was not my decision, Your Honor. That was the decision... Well, you're the government. You're the United States government, the prosecutor. That's right, Your Honor. I'll agree with you that this is exceedingly rare for a defendant to get a sentence. I have never seen this happen before for a defendant to get extradited, come back, and then get no time at all. I think in part, it's a recognition of the sentence he served there. I'm not doubting that. If you're going to do all that, why didn't you take care of this issue with the plea agreement and the agreement to let him walk? I'm sorry, Your Honor. Why didn't you take care of this? Have him waive any further litigation about the thing? Sure. You were letting him off the hook. That's right. Completely. Except that then you left yourself having to do this work. Sure. That's another thing that's exceedingly rare is to let the defendant conditionally plea. This court actually doesn't really have any clear precedent that tracks these facts. Most of the reason why there's so many out-of-circuit cases in our brief is because... This is a unique set of facts. This is a unique set of facts. As far as I'm aware... We're plowing a new furrow. A little bit. There's some guidance from other courts of appeals and the Supreme Court, but I'd say this is pretty close to an issue of first impression. Do you have any... From your standpoint, there's been this argument that this prosecution and sentence and everything that he had in Pakistan was a sham. How's that? What's your position on that? What do we make of that? He says you don't dispute it. Is it that you don't just... You agree with that or you're just assuming it and it doesn't make any difference? Tell me what we're supposed to do from the government standpoint about that argument. I think you're supposed to do nothing with it because it's just pure speculation. That's completely untethered to the record. The fact the trial court made to anybody else. No one's made that as a final fact. That's just something you just think. Well, that's right. I'm sure the United States is going to say that and then the public... I'm pretty sure it's not going to say that. Well, it's just speculation. I have no reason when I look at the record to tell you, yes, your honor, this is a sham prosecution. It's speculation to say it's a sham set of facts? That's right. Is that what you're saying? That's right. Normally, it wouldn't think it was a sham when the guy goes to the penitentiary for 10 years. I agree with that and there are certainly mechanisms. That would be a sham set of facts when he pleads guilty to terrorism and walks out of the courtroom. That might look like more of a sham. I understand that. The EDVA prosecution was not a sham though, but I understand your honor's point. Thank you, your honors. Thank you very much. We appreciate you. Mr. Kamen? First, let me talk about the sham. The evidence in the records that JA-293, that's a declaration from Mr. Chaudhry's father who attended the trial and submitted a declaration to the district court saying that he observed fraudulent evidence being admitted, witnesses testifying that he knew Mr. Chaudhry's family and it was about him. What did the trial court do with that? Did it make a finding of fact? It did and the findings of fact are in the sealed- Was it a finding of fact that it was a sham? Oh, no. The district court did not. The district court decision was before that declaration. The father that went there and said it was a sham, I've probably heard that a few times here in the United States. It looked like a sham to me. Fair enough. A lot of times the defendant says it. Well, let me say this again. If it wasn't a sham, if there was real evidence of it, the Pakistani authorities accused Mr. Chaudhry of providing money to Jaish-e-Mohammed, the same group that's involved in the offensive conviction. If that were true, the government would have provided it in discovery. It would be in the statement of facts. The defendant submitted an amount of money of 200 rupees to Jaish-e-Mohammed and Jaish-e-Mohammed submitted a receipt. The proof in Pakistan was that all five defendants got receipts from this banned organization in Pakistan. That's not part of the discovery I received from the U.S. government. It's not part of the statement of facts on the offensive conviction and it's because it's completely fraudulent. The government knew it. Everybody knew it. But Pakistan had its own interest for pursuing that prosecution. I heard Judge Qualiphant mention to you that that whole business, whether it was a sham, there is something that cuts both ways. Certainly. But again, the law is that we can't... It depends on how it cuts for you. Pushing it may or may not help. But again, from the speedy trial right perspective, we can't assume what Pakistan's answer would be. It compels the conclusion that the U.S. had no considered interest in waiting until Pakistan proceeded with its judicial process. Initially, the U.S. asked Pakistan to deport these individuals immediately and forego the Pakistani process. Pointing to that communication, which my friend just did, JA114, a Pakistani diplomat, and that's a communication. It's a readout of a communication from the Pakistani Ministry of Interior where the diplomat said, the government of Pakistan will want the U.S. government to follow the formal extradition process. The request from Pakistan in December of 2009 was for the United States to ask for extradition, and the U.S. didn't. And why did they not? Because, my friend says, Mr. Olsen from the OIA, Office of International Affairs, said it's hard. What sentence did he face in the United States for the charges? Well, I believe at that time the maximum for material support is 15 years. It's now changed to 20. I think the maximum was 15 years. For some reason, I believe he would have gotten less than 10 here. Well, I mean, given the current circumstances where he had horrific imprisonment in Pakistan. Conditions. I'm talking about the fact of imprisonment. So I understand that you might be complaining he wasn't treated in the same manner as the United States prison. So that's a whole different argument. But if it's the sentence of 10 years, well, he would have gotten 10 years here. Your complaint is it would have been a different situation, and maybe more humane. But is he, I don't know, what is his condition now? Let me say this. That material support case has come in a wide variety of flavors. And there are people who are really dangerous and really committed. And then you have a bunch of jihadi wannabes. And people have no training. I'm trying to make it sound like it's the same. I will accept that it probably is much different. I'm just talking about the sentence itself. If he was, because initially when he was there, did you fight, wasn't he against extradition at the beginning? He did oppose extradition once he was released. He didn't want to be extradited. Well, that's true. And he's a Pakistani citizen. So it reminds me of Paul saying, I'm a Roman. I want to be tried by the Romans, not by the Hebrew system. Biblical thing. I'm just, but anyway. So he's there. He declares, I'm Pakistani. I don't want to be tried in a Pakistani court. I don't want to be extradited. No, they're important. Does he have a right to do that? He has a right to defend himself in extradition. And there are important rights that you can obtain in extradition proceedings, such as narrowing the charges upon which you're extradited. If there's a death penalty charge, perhaps the country won't extradite. But that is interesting. I mean, you think about it. He's in Pakistan. He's a citizen of Pakistan. And the United States, he's another citizen, wants him there. But he says, no, I do not want to be extradited to the United States. And maybe he says, I'm a Pakistani citizen. Isn't there some teeth there that maybe he, you know? I think you're pointing to the idea of waiver. That is that he's waiving his speech. I'm not talking about waiver. I'm just talking about the whole circumstance of the government, the United States involved in it too, because he belongs to two different countries. And that's a factor on his part. It's not like he was trying to get himself extradited. He was trying to stay. So extradition applies to both citizens and non-citizens. And so just because he contested extradition, if I'm understanding the court's question, it doesn't mean that he's asserting his citizenship. It's just he's saying that the government needed to abide by the process and the substance of the extradition procedure. My time has expired, but I do want to get out that this Article 4 provision of the extradition treaty, it is just a timing of surrender provision that can be waived by a sovereign. We've submitted cases and the government points to Mr. Olson's declaration, but he's construing Article 4, and that's at page JA-158, paragraphs 30 and 31. He's not saying that at the time of the 2010 communication, they said, we've looked at Article 4 and we're declining to extradite based on that basis. Thank you. Thank you, Mr. Kamins. We appreciate you. Thank you. We'll come down to Greek Council and take up the next case.
judges: Robert B. King, James Andrew Wynn, A. Marvin Quattlebaum Jr.